```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

                       CHARLESTON


SANDRA HERSHBERGER
and DAVID MITCHELL,
her husband,

       Plaintiffs,

v.                                  Case No. 2:10-cv-000837

ETHICON ENDO-SURGERY, INC.,
an Ohio corporation, a subsidiary of
JOHNSON & JOHNSON, a New Jersey
corporation,

       Defendants.
```

## MEMORANDUM OPINION AND ORDER

In a Memorandum Opinion, Order and Recommendations filed August 12, 2011 (ECF No. 264, amended September 23, 2011, ECF No. 287, "the Sanctions Order"), the Court granted the plaintiffs' motion for sanctions (ECF No. 131), and indicated the need for additional information before determining the extent of the sanctions to be imposed. The additional information has been filed. This Order should be read with the Sanctions Order, as the facts and analysis contained in the Sanctions Order are not repeated here.

The Sanctions Order required defendant Ethicon Endo-Surgery ("Ethicon") to submit "an affidavit by a person with extensive knowledge of the Siebel database and its metadata (<u>not</u> Kristi

Geier), setting forth the following information regarding searches of the Siebel database concerning staplers, using the VOC code 'would not staple,' between February 6, 2009 and June 3, 2011: a. The date of each search; b. the name and title of the person who performed each search; and c. the results of each search." (ECF No. 287, at 21.) Ethicon timely filed its response, which includes two affidavits by persons with knowledge of the Siebel database. (ECF No. 268.) According to the response, the Siebel database is not capable of producing a record of the searches which are made of it. Id. at 2. Thus it became necessary to examine employees' computers for Excel files which would contain the results of a Siebel database query. Id. There were two queries, one on December 14, 2010, by Jamie Gast for the use of Theresa Vogel, and the other on March 8, 2011, by Ms. Vogel and Ms. Kristi Geier. Id. at 2-3.

The defendants state as follows with respect to the December 14, 2010 and March 8, 2011 searches:

> On December 14, 2010, Jamie Gast, a member of Ethicon's Customer Quality group, downloaded all records in Siebel related to all intraluminal staplers and transported that file into Excel for Theresa Vogel's use. This download was not specific to CDH staplers . . . and was not done by VOC code. Thus, although Mr. Gast did not query the VOC code "would not staple," the records associated with this VOC code were included in his result as were the records for every VOC code for every model of intraluminal staplers.
>
> Because the allegations in this case were that the stapler at issue was manufactured without staples and without a breakaway washer and as a result of

2

> conversations with Ms. Geier and the Customer Quality department, Ms. Vogel then excerpted out of this data file CDH complaints associated with the VOC codes "missing staples," "anvil not returned," "damaged component" and "staple retention" in order to search for complaints responsive to Plaintiffs' Third Set of Requests for Production of Documents. Ms. Vogel did not query the VOC code "would not staple" and documents associated with that code were not part of the electronic group of records that Ms. Vogel and Ms. Geier worked from in answering these discovery responses because the request asked for reports which alleged that the device failed to fire due to a lack of staples.

(ECF No. 268, at 3.)

The March 8, 2011 query was triggered as a result of a question by an attorney with Guthrie & Thomas.

> This was the first time the VOC code "would not staple" was queried in the Siebel system in relation to this case. The results of this query were transported into Excel and Ms. Vogel reviewed these complaints to determine if they contained documents that should have been coded as "missing staples" but had in fact been inadvertently coded as "would not staple." Ms. Geier and Ms. Vogel did not believe that these "would not staple" documents were responsive to the Plaintiffs' Third Set of Requests for Production of Documents seeking reports where a stapler failed to fire due to a lack of staples.
>
> On May 25, 2011, counsel from Guthrie & Thomas had a conference call with Ms. Geier and Ms. Vogel in regard to responding to Plaintiffs' Ninth and Tenth Sets of Requests for Production of Documents (which were different than the earlier requests) which by agreement of the parties were due on June 3, 2011. During that call Ms. Geier and Ms. Vogel discussed with counsel the documents that were retrieved in the March 8, 2011 search using the VOC code "would not staple." As a result of the call, Ms. Geier sent the "would not staple" documents to counsel for production.

Id. at 3-4.

Since February 19, 2009, the defendants have had actual

knowledge of the plaintiffs' allegations (based on the statements of Ms. Hershberger's surgeons) with respect to the stapler, that is, the stapler was properly positioned, it was fired, the stapler cut the tissue but no staples were ejected. Whether the plaintiffs' counsel described the incident as "stapler not loaded with staples," (Request No. 16, First Set), or "stapler failed to fire due to a lack of staples," (Request No. 1, Third Set), the allegations have remained the same throughout this litigation.

The plaintiffs served Request No. 16, First Set on August 24, 2010. (ECF No. 7.) Within thirty days of August 24, 2010, the defendants should have queried the Siebel database for information of other similar incidents, and they did not do so. Their response that "there are no documents," was explained as being limited to litigation, which the undersigned has described in the Sanctions Order as "unreasonable in the extreme and, frankly, nonsensical." (ECF No. 287, at 11.) After further review of Ms. Geier's testimony at the July 28, 2011 hearing, and consideration of the defendants' response to the Order at ECF No. 268, it appears that no query was made of the Siebel database for Request No. 16, First Set, even though Ms. Geier described the Siebel database as "when someone reports an incident with one of our devices, all of the information regarding that incident is captured in Siebel." (ECF No. 267, at 73.) In short, the Siebel database is the single source for information of other similar incidents involving the

defendants' products. The defendants' failure to search the database in the fall of 2010 is inexcusable and sanctionable.

The December 14, 2010 query of the database for information as to all intraluminal staplers was apparently prompted by the plaintiffs' Request No. 1, Third Set, which asked for pertinent Product Inquiry Verification Reports. The production of one such Report, and the subsequent production of an additional six Reports are described in the Sanctions Order, at page 13. It is apparent that little effort was made to compare the facts of the instant litigation with the facts recited in the Siebel database entries relating to staplers. If care had been taken to confirm that the VOC codes were producing data relevant to this case, at least 44 records, and perhaps many more, should have been produced. As of December 14, 2010, Ms. Vogel had an Excel file with all the producible records within it.

The defendants have chosen to rely on the Siebel database despite its limitations, including the possibilities for errors in assigning a VOC code for a given report and in selecting VOC codes to find other similar incidents. Having made the choice to rely on the Siebel database, the defendants are responsible for the failures of their system. When they uncover deficiencies in their database and when they learn that their prior responses are incomplete or incorrect, they have a continuing duty to supplement their discovery responses. Fed. R. Civ. P. 26(e)(1)(A).

The defendants state that "Ms. Geier and Ms. Vogel did not believe that the 'would not staple' documents were responsive to the Plaintiffs' Third Set."  (ECF No. 268, at 3.)  The undersigned has reviewed more than twenty reports from the Siebel database with the VOC code "would not staple" and they describe incidents which are very similar identical to that of Ms. Hershberger.  Based on what this judicial officer has reviewed, Ms. Geier's and Ms. Vogel's beliefs as to responsiveness were not reasonable.

To summarize, in August, 2010, the plaintiffs served Request No. 16, First Set; in October, 2010, the defendants failed to search their single source for information and responded that there were "no documents."  If one does not look for an item, one is not likely to find it.  In November, 2010, the plaintiffs served Request No. 1(a), Third Set; in December, 2010, the defendants searched the Siebel database, and downloaded an Excel file with all the producible and relevant records.  Apparently without consultation with counsel or careful comparison of the records with the plaintiffs' allegations, the defendants produced one record, having limited the production to a seven year period in the United States.  After the plaintiffs' attorney complained about the artificial limitations and threatened to file a motion to compel, seven records were produced, <u>after</u> the plaintiffs took Mr. Gabaldon's first deposition.  It appears that at least 44 records should have been produced.  In February, 2011, the plaintiffs

6

served Request No. 2, Tenth Set and motion practice ensued.[1] The motion practice resulted in an order that the defendants respond to both the plaintiffs' Tenth Set and Ninth Set (which had not been previously served due to a clerical error). Meanwhile on March 8, 2011, the "would not staple" VOC code was queried, and two non-lawyers (Vogel and Geier) decided that the "would not staple" VOC code was producing records which were not responsive. The "would not staple" VOC code is listed on the 21 reports which this judicial officer reviewed and agreed are responsive. On May 24, 2011, the plaintiffs deposed Mr. Gabaldon again; the next day the defendants' attorneys discussed the "would not staple" VOC code with Ms. Geier and Ms. Vogel, resulting in the production on June 3, 2011, of more than 100 records.

To analogize the discovery phase of this litigation to a freight train, the case began traveling down the tracks with initial disclosures. Upon receipt of the plaintiffs' First Set of discovery requests, Ms. Geier threw a switch, thereby sending the train in the wrong direction ("no documents"). For the following year, the plaintiffs' attorney pushed and pulled on the train to get it back on the correct tracks (one document, seven documents, 44 documents). In addition to the unnecessary loss of time and money, if plaintiffs' counsel had not been relentless in his

---

[1] Due to misinformation from chambers staff, there was confusion as to whether the plaintiffs' Tenth Set was served within the discovery period.

pursuit of the evidence, the evidentiary picture would have been substantively different. If Carlos Gabaldon is not challenged in his assertion that it is "impossible" for a stapler to leave the factory without being loaded with staples, then it is much more likely that only the surgeons will be blamed for the mishap with Ms. Hershberger. This judicial officer does not know what happened during the surgery, but she is persuaded that the defendants' employees consistently made decisions which resulted in the suppression of evidence of other similar incidents, and the defendants' attorneys did not ask sufficient questions of their clients. To illustrate the difficulties faced by plaintiffs' counsel, the Court heard testimony at the evidentiary hearing in which it was suggested that Mr. Brinkley was at fault for not traveling to Cincinnati, Ohio to review the Siebel database with the defendants' employees. (Tr. Evid. Hrng, ECF No. 267, at 76-77.) Twice Mr. Brinkley inquired of defense counsel about that access, but he received no response. Id. at 95.

In the Sanctions Order, the Court stated its intention, at a minimum, to require payment of the plaintiffs' attorney's reasonable fees and costs associated with the Motion for Sanctions, the filing of discovery requests for other similar incidents after Request No. 16, and Mr. Gabaldon's two depositions. (ECF No. 288, at 20-21.) Ethicon Endo-Surgery has stated that it "will pay the full amount of any award for attorney's fees and costs." (ECF No.

8

277, at 10.)

Having determined that the response to the plaintiffs' Request No. 16, First Set, was unreasonable, inexcusable and sanctionable, the Court has reviewed the affidavit of fees and expenses, including the time report, filed by the plaintiffs' attorney, Christopher L. Brinkley, found at ECF No. 275.  The defendants filed a response in opposition to Mr. Brinkley's affidavit of fees and expenses (ECF No. 277), and Mr. Brinkley has filed a reply (ECF No. 280).

## Hourly Rate

The first issue in dispute is whether Mr. Brinkley's claimed hourly rate of $450 is unreasonably high for an attorney-engineer who specializes in products liability litigation, serving as lead counsel, with sixteen years of experience.  Mr. Brinkley has provided his resumé, which is extensive.  (ECF No. 275, at 8-12.)

This judicial officer regularly reviews hourly rates of attorneys in relation to claims for costs and fees, including attorneys' fees, pursuant to Rule 37 of the Federal Rules of Civil Procedure.  Hourly rates in Charleston and Huntington vary widely according to attorneys' reputation, expertise, experience, success and typical client base.  Corporate defense attorneys in this region typically bill at lower rates than East Coast metropolitan firms with hundreds of lawyers and higher overhead expenses. Defense attorneys are more likely to bring more than one lawyer to

a hearing; the defendants had three lawyers at the hearing on sanctions; the plaintiffs had Mr. Brinkley and a paralegal. Taking just the hearing on sanctions as an example, Mr. Brinkley claims $450 per hour for 4.25 hours ($1,912.50); the defense attorneys were billing a total of $763 per hour ($3,242.75).  (See ECF No. 286.)

The Court has considered the time and labor expended by Mr. Brinkley in his dogged persistence to obtain disclosure of other similar incidents, the questions raised, his skills, his opportunity costs, customary fees charged, the time limits imposed by the scheduling order, his experience, reputation and ability, and attorneys' fees awarded in similar cases.  In this judicial officer's experience, Mr. Brinkley's claimed hourly rate of $450 exceeds any rate charged by an attorney in this District by at least 10%.  As both an engineer and an attorney, Mr. Brinkley possesses unusual educational credentials and expertise justifying an hourly rate which exceeds that of most attorneys of comparable experience.  Accordingly, the Court deems $400 per hour to be a reasonable rate for Mr. Brinkley.  The Court acknowledges Chief Judge Goodwin's conclusion that $500 per hour is the high end of the market, as reported in Jones v. Dominion Resources Services, Inc., 601 F. Supp.2d 756, 766 (S.D. W. Va. 2009), a class action case concerning oil and gas royalties with a settlement fund of $50 million.  Class action litigation and single-plaintiff cases are

sufficiently different from each other to justify $400 per hour.

## Time Charges

The defendants challenge some of the activities listed in Mr. Brinkley's time report. The Sanctions Order stated the Court's intention to award reasonable fees and costs associated with the Motion for Sanctions, the filing of discovery requests for other similar incidents after Request No. 16, and Mr. Gabaldon's two depositions. (ECF No. 288, at 20-21.) The Court notes that the fees and costs are being awarded pursuant to Rule 26(g), which affords the Court considerable discretion, and not Rule 37.

The defendants list "examples" of time charges which they dispute; if the defendants did not list all the items which they contest, they have missed their opportunity. They did not specifically identify by date the time charges they challenge, thus making it more difficult to find them. While the Court has examined the time report with care, it will not make the defendants' arguments for them.

The defendants dispute the following:

| Date | Description | Time |
|---|---|---|
| 1/29/11 | Notices of depositions | 0.5 |
| 1/31/11 | Amended notices of depositions | 0.5 |
| 2/10/11 | Review of Gabaldon report | 0.5 |
| 2/21/11 | Prepare for deposition on other incidents | 2.25 |
| 2/24/11 - 3/6/11 | Four emails regarding production of other incidents | 1.0 |

11

| 3/8/11 | Review of seven other incidents | 1.25 |
|---|---|---|
| 2/22/11 | Travel to El Paso for depositions | 9.0 |
| 2/23/11 | Deposition of Carlos Gabaldon | 3.0 |
| 3/18/11 - 4/27/11 | Plaintiffs' motion to compel, ECF No. 79, and Order granting, ECF No. 100 | 14.0 |
| 5/12/11 | Communications re compelled discovery | 0.5 |
| 6/3-7/11 | Review of other similar incidents | 7.5 |
| 6/17/11-8/12/11 | Motion for Sanctions re conduct other than other similar incidents | Extensive but not itemized |

The first basis for the defendants' challenges is that most of this work would have been done anyway. The deposition notices would have been prepared; Gabaldon's report would have been reviewed; plaintiffs' counsel would have prepared for the deposition on other similar incidents, traveled, and deposed Mr. Gabaldon; and he would have reviewed the documents of other similar incidents. (ECF No. 277, at 6-8.) The second reason given by the defendants is that the plaintiffs should not recover their costs relating to the motion to compel at ECF No. 79 (see footnote 1 above). Id. at 8. The third ground for reducing the expenses is that the defendants argue that the time spent on the motion for sanctions should be apportioned according to the plaintiffs' success; that is, sanctions were imposed with respect to the other similar incidents, and not as to other conduct. Id. at 8-9. The defendants complain that they should not have to pay for both trips

to El Paso, Texas for Mr. Gabaldon's depositions. Id. at 9-10.

The plaintiffs reply that they were complying with the directions in the Sanctions Order when they prepared the affidavit, and that the entries are consistent with the Sanctions Order. (ECF No. 280 at 6-7.) They explain why it was necessary to perform each of the challenged tasks and how the defendants' conduct impeded their search for evidence. Id. at 8-11. With respect to the defendants' apportionment argument, the plaintiffs point out that they always contended that the centerpiece of the motion for sanctions was the belated and grudging disclosure of other similar incidents after unrelenting prodding. Id. at 11. The plaintiffs used the defendants' other acts to demonstrate that the defendants had a pattern and practice of impeding discovery. Id.

The Court notes that Rule 26(g) does not contain language similar to Rule 37(a)(5)(C) concerning the apportionment of expenses according to the extent of relief awarded or denied. The only limitation on the Court's discretion in imposing a Rule 26(g) sanction which includes an order to pay expenses, including attorney's fees, caused by the violation, is that the expenses be "reasonable." The primary and most egregious violation of Rule 26(g) was the response to Request No. 16, First Set. If the defendants had conducted an appropriate Siebel database query within thirty days of the First Set of discovery requests, it is doubtful that a motion for sanctions would have ever been filed.

13

Instead, due to that unjustifiable omission, the plaintiffs were forced to file repeated additional discovery requests, to depose Mr. Gabaldon twice without sufficient documents having been disclosed prior to either deposition, and to review critical evidence of other similar incidents *after the close of discovery*. The plaintiffs were deprived of the opportunity to form their theory of the case early in the discovery period and to pursue that theory vigorously.  Some of the other similar incidents occurred in Europe; the plaintiffs may have preferred to arrange for further exploration of those incidents.  In other words, the defendants altered the course of this litigation for a year, for no good reason, and it is appropriate that they pay the price.

The only time charges which the Court declines to award to the plaintiffs relate to the motion to compel at ECF No. 79.  The Order entered in relation to the motion specified that the parties "shall bear their own costs."  (ECF No. 100.)  Accordingly, the Court will subtract 14.0 hours from the time charges.

It is hereby **ORDERED** that the Court awards the plaintiffs reasonable attorney's fees in the amount of $48,000 (120 hours x $400) and costs in the amount of $5,350.36, for a total of $53,350.36, to be paid by Ethicon Endo-Surgery to the Masters Law Firm no later than October 28, 2011.

The Clerk is directed to transmit this Order to counsel of record.

ENTER: October 4, 2011

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge